## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| MERCY HOSPITAL SOUTH<br>10010 Kennerly Road<br>St. Louis, MO 63128<br><br>    Plaintiff,<br><br> v.<br><br>XAVIER BECERRA, in his official capacity as<br>Secretary of the<br>DEPARTMENT OF HEALTH AND HUMAN<br>SERVICES,<br>200 Independence Avenue SW<br>Washington, DC 20201, and<br><br>CAROLE JOHNSON, in her official capacity as<br>Administrator of the<br>HEALTH RESOURCES AND SERVICES<br>ADMINISTRATION,<br>5600 Fishers Lane<br>Rockville, MD 20857,<br><br>    Defendants. | Cause No.: 4:23-cv-1226 |

### **COMPLAINT FOR JUDICIAL REVIEW**

Mercy Hospital South sues Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services (HHS), and Carole Johnson, in her official capacity as Administrator of the Health Resources and Services Administration (HRSA), seeking judicial review of HRSA's: (1) imposition of a Letter-Perfect Standard upon Plaintiff without prior notice; (2) refusal to grant Plaintiff funding from the Provider Relief Fund due to a typographical error in its application; and (3) refusal to consider, both initially and on reconsideration, included supporting documentation refuting the typographical error—actions which were arbitrary,

4871-3374-4753v4

capricious, in violation of law, an abuse of discretion, and denied Plaintiff its Constitutional right to due process.

## I. STATEMENT OF THE CASE

1. Plaintiff, Mercy Hospital South, is a not-for-profit hospital that has long cared for the patient population to the south and west of St. Louis. Plaintiff is the only Level II Trauma Center traveling south or west from St. Louis until Greene County or Boone County; likewise, Plaintiff is one of only two Level I STEMI and Stroke centers for southeastern Missouri.

2. When the COVID-19 pandemic struck in March of 2020, Plaintiff, its colleagues, and its providers were called to respond, redoubling efforts toward their Mission to bring to life the healing ministry of Jesus through compassionate care and exceptional service.

3. Congress is explicitly authorized to appropriate funds from the United States Treasury. U.S. Const. art. I, § 9, cl. 7 ("No money shall be drawn from the Treasury but in consequence of appropriations made by law.").

4. In March of 2020, Congress appropriated 100 billion dollars in part to reimburse "eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." P.L 116-136, March 27, 2020, 134 Stat. 281 (Div. B, Tit. VII).

5. A month later, Congress appropriated an additional 75 billion dollars to reimburse "eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." P.L. 116-139, April 24, 2020, 134 Stat. 620 (Div. B, Tit. I).

6. Congress appropriated these funds to HHS as additional discretionary spending and further tasked the Secretary with distributing them. HHS used these appropriations to create the Provider Relief Fund (PRF) and delegated the task of administering the PRF to HRSA. HHS had created HRSA August 20, 1982, when it consolidated two of its subagencies: the Health Resources Administration and the Health Services Administration.

7. HRSA must exercise its discretion to distribute these funds in compliance with Part 75 of Title 45 of the Code of Federal Regulations. *See* 45 C.F.R. §§ 75.1 *et seq*, authorized by 5 U.S.C. § 301.

8. During the Public Health Emergency, HRSA distributed PRF payments via multiple General and Targeted Distributions.

9. Several PRF distributions were made to eligible health care providers without any affirmative action required of the provider. Providers were, however, required to submit an application for the relevant Phase 3 General Distribution.

10. The application process for Phase 3 opened October 5, 2020, and ended November 27, 2020. The application was two pages long (excluding supporting documents submitted by the applying entity) and asked for minimal information.

11. The key data the application required was Operating Revenues from Patient Care and Operating Expenses from Patient Care for Quarters 1 and 2 of 2019 and Quarters 1 and 2 of 2020. Applicants were also required to submit certain supporting documentation in order to validate the numbers reported for Operating Revenues and Operating Expenses from Patient Care.

12. The Hospital submitted a completed Phase 3 application prior to the November 27, 2020 deadline.

13. As required, Plaintiff attached supporting documents to its application showing its Operating Revenues from Patient Care and Operating Expenses from Patient Care for Quarters 1 and 2 of 2019 and Quarters 1 and 2 of 2020.

14. The Plaintiff did not receive a Phase 3 General Distribution.

15. Plaintiff later determined it inadvertently entered incorrect Operating Expenses for Quarter 2 of 2019 and Quarter 2 of 2020. Specifically, the Hospital inadvertently entered Operating Revenue at those fields instead of Operating Expenses.

16. The correct values were included in the supporting documentation as part of the original Phase 3 application.

17. Had HRSA issued a grant based on those correct values, the Hospital estimates it would have received approximately $14.3 million in additional PRF payments from the Phase 3 General Distribution.

18. HRSA failed to review or consider the supporting data submitted with Plaintiff's application when it denied Plaintiff's request for funding.

19. Further, even after Plaintiff notified HRSA of its data-entry error and submitted a corrected application, HRSA refused to reconsider the corrected application.

20. HRSA has arbitrarily and capriciously, in violation of its legal mandate, and in abuse of its discretion, refused to distribute a grant to Plaintiff for the estimated $14.3 million to which it would otherwise be entitled.

21. HRSA's arbitrary and capricious action, in violation of law and in abuse of its discretion, has irreparably harmed Plaintiff. Compared to the first and second quarters of 2019, where it was net-positive, Plaintiff lost $5,774,243 and $25,303,993 in the first and second quarters of 2020, which is entirely attributable to the coronavirus.

4

22. The PRF distribution that would have been granted to Plaintiff based on its timely application, sufficient and accurate supporting documentation, and the calculation published by HRSA, represents obligated funds that HRSA is required to pay to the Plaintiff. Alternatively, on information and belief, unobligated funds remain in the PRF for distribution.

23. Plaintiff seeks this Court's intervention, specifically requesting that it:

    a. Vacate the initial determination of HHS and/or HRSA refusing to issue to Plaintiff a Phase 3 General Distribution;

    b. Vacate the reconsideration determination of HHS and/or HRSA again refusing to issue to Plaintiff a Phase 3 General Distribution;

    c. Order HHS and/or HRSA to process Plaintiff's application taking into account the information originally included in the Plaintiff's full application submission and issue any Phase 3 General Distribution that is appropriate on the basis of that information; and

    d. Order HHS and/or HRSA to compensate Plaintiff for all legal fees and costs of suit incurred by Plaintiff as well as any outstanding interest due and owing pursuant to any applicable statute or regulation.

## II. JURISDICTION AND VENUE

24. Federal law conveys subject-matter jurisdiction to this Court to hear Plaintiff's requests for relief pursuant to the Administrative Procedure Act, Declaratory Judgment Act, All Writs Act, and Constitution. 5 U.S.C. §§ 701-706; 28 U.S.C. § 2201; 28 U.S.C. § 1361; 28 U.S.C. § 1651; 28 U.S.C. § 1331; U.S.C.A. Const. Amend. XIV.

25. Venue is proper in this district under 28 U.S.C. § 1391(e) because Plaintiff resides and operates in this district and a substantial part of the events giving rise to these claims occurred in this district.

### III. PARTIES

26. Plaintiff, Mercy Hospital South, Medicare Provider No. 26-0077, is a Medicare-participating, general acute care hospital provider, enrolled in the federal Medicare program, operated by a not-for-profit organization under § 501(c)(3) of the Internal Revenue Code.

27. Plaintiff operates at 10010 Kennerly Road, St. Louis, MO 63128.

28. Xavier Becerra is the Secretary of the United States Department of Health and Human Services (HHS) and is named in this suit in his official capacity only.

29. Carole Johnson is the Administrator of the Health Resources and Services Administration (HRSA) and is named in this suit in her official capacity only.

30. HRSA is a division of HHS which administered the Public Health and Social Services Emergency Fund and Provider Relief Fund (PRF) on behalf of HHS.

31. Congress tasked Secretary Becerra and Administrator Johnson with distributing funds to health care providers to reimburse them for health care related expenses or lost revenues attributable to coronavirus.

### IV. STATUTORY AND REGULATORY BACKGROUND

32. Beginning March 6, 2020, and continuing through April 24, 2020, Congress began appropriating hundreds of billions of dollars to HHS and other federal agencies to support Americans during the COVID-19 pandemic. Pub. L. 116-123, 134 Stat. § 146 (2020); Pub. L. 116-127, 134 Stat. § 178 (2020); Pub. L. 116-136, 134 Stat. § 281 (2020); Pub. L. 116-139, 134 Stat. § 620 (2020). These appropriations were added

to the Public Health and Social Services Emergency Fund and distributed via the PRF—programs which HHS and HRSA supervised and administered.

33. Congress appropriated these funds with particular provisions, including a requirement that the Secretary "reimburse, through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." 134 Stat. § 563.

34. HRSA distributed these funds in phases. Phase 3 was a General Distribution based on total operating revenues and total operating expenses from patient care. https://www.hrsa.gov/provider-relief/payments-and-data/past-payments/general-distribution (last viewed July 18, 2023).

35. This Phase 3 General Distribution came with terms and conditions. (Exhibit 1). HRSA offered specific instructions for providers completing the application for Phase 3 General Distribution from the PRF. (Exhibit 2). HRSA updated its published Provider Relief Fund and ARP Rural Payments Frequently Asked Questions (FAQ) to include the Phase 3 General Distribution. (Exhibit 3).

36. HRSA further described its methodology for determining the value of its distributions to hospitals. (Exhibit 4). Essentially, eligible providers would receive an amount equal to the greater of either 2% of their annual patient care revenue or 88% of their adjusted losses (after all prior PRF payments were deducted). *Id.* at 1.

37. This FAQ guidance described a multi-layered process which included manual review under certain circumstances—such as when an application was incomplete. *Id.* at 5.

## V.     FACTUAL BACKGROUND

38. HRSA opened the online portal for applications for the Phase 3 General Distribution on October 5, 2020.

39. On November 2, 2020, Plaintiff timely completed the Phase 3 application and attached the supporting documents HRSA requested. (Exhibits 5-8).

40. Plaintiff met all of the eligibility criteria to receive a Phase 3 General Distribution: it is enrolled in Medicare and Medicaid, serves CHIP beneficiaries, and provides diagnosis, testing, and care for patients affected by COVID-19 (often at its own expense or with no expectation of payment).

41. On Line 13 of the application form, Plaintiff entered its operating revenues from patient care for the first two quarters of calendar years 2019 and 2020:

```
13. OPERATING REVENUES FROM PATIENT CARE

(13.1) 2020 Q1 (Jan 1 – Mar 31): 113860178      (13.2) 2020 Q2 (April 1 – June 30): 96302901
(13.3) 2019 Q1 (Jan 1 – Mar 31): 120843129      (13.4) 2019 Q2 (April 1 – June 30): 124046258
```

(Exhibit 5). Plaintiff's operating revenues from patient care are one component of its total operating revenue. (*See* top two summary tables, Exhibits 7 & 8).[1]

42. Line 14 requested information about operating expenses from patient care for the same periods. Because Plaintiff's operating expenses from patient care comprise its total operating expenses, Plaintiff relied on the bottom two summary tables of Exhibits 7 & 8, showing its total operating revenues and expenses for the period.

---

[1] Exhibits 7 and 8 were a year-on-year comparison of various components of Plaintiff's operating revenues and expenses, and are the same document. These documents tracked financial data according to the quarters of Plaintiff's fiscal year (FY), ending June 30, rather than the calendar year (CY). Thus, the data requested by HRSA for CY 2019 Q1 and Q2 correlates to Plaintiff's FY 2019 Q3 and Q4 data shown in the exhibits (labeled Q3 and Q4 of the "PRIOR YEAR" in these Exhibits). Similarly, the requested data for CY 2020 Q1 and Q2 correlates to Plaintiff's FY 2020 Q3 and Q4 data (labeled Q3 and Q4 of the "CURRENT YEAR").

Plaintiff's 2019 and 2020 supporting documents contained the correct revenue and expense numbers. (Exhibits 7 & 8).

43. The excerpt below shows Plaintiff's Q4 total operating revenues and expenses for FYs 2020 and 2019:



(Exhibit 7 & 8). When entering the CY Q2 data requested in Lines 14.2 and 14.4, Plaintiff mistakenly entered the revenue figures from the top line of the table shown above, rather than the expense figures from the second line:

**14. OPERATING EXPENSES FROM PATIENT CARE**

(14.1) 2020 Q1 (Jan 1 – Mar 31): 119634421     (14.2) 2020 Q2 (April 1 – June 30): 109093731
(14.3) 2019 Q1 (Jan 1 – Mar 31): 118276673     (14.4) 2019 Q2 (April 1 – June 30): 126982468

(Exhibit 5).

44. This data-entry error overstated Plaintiff's Q2 CY2019 operating expenses by $5,953,412 ($126,982,468 vs. $121,029,056) and drastically understated its Q2 2020 operating expenses by $12,513,163 ($109,093,731 vs. $121,606,894). As demonstrated in the Sum of Variance column of the table excerpted above, Plaintiff's application erroneously showed a $17.89 million *reduction* in operating expenses from 2019 to

2020, instead of the $577,838 *increase* in operating expenses that it actually experienced that quarter.

45. In Q2 CY2019 (pre-COVID), Plaintiff's net revenue for the quarter was +$3,017,202 ($124,046,258 - $121,029,056), but the application erroneously suggested a net loss of -$2,936,210 ($124,046,258 - $126,982,468).  One year later, Plaintiff's net loss attributable to COVID in Q2 CY2020 was -$25,303,993 ($96,302,901 - $121,606,894), but the numbers included in the application reflected an understatement of about half, reflecting a net loss of only -$12,790,830 ($96,302,901 - $109,093,731).

46. HRSA never notified Plaintiff that it would hold PRF Phase 3 applicants to the Letter-Perfect Standard. *See, e.g., Salzer v. F.C.C.*, 778 F.2d 869, 873 (D.C. Cir. 1985). Likewise, neither the application instructions, supporting materials, FAQ, nor Terms and Conditions notified hospitals that HRSA would refuse to reconcile typographical or data-entry errors with supporting documentation included in their application, and that HRSA would strictly construe such data-entry errors against the applicant.

47. Instead, the Instructions and FAQ implied that the documents submitted in support of the application would be considered as part of the application process: "You should not apply until you have available all of the required information *and documentation* necessary to submit a complete and accurate application." (Exhibit 2 at 4; Exhibit 3 at 67).

48. HRSA also affirmed that it would flag "high-dollar applications" for manual review of supporting documentation during Phase 3. (Exhibit 4 at 4-5). Reviewing the materials against the application would have identified the data-entry error so the application could be processed accurately.

10

49. Despite these written, published assurances, Plaintiff was denied a Phase 3 General Distribution.

50. In September of 2021, HRSA announced a formal reconsideration process for providers who had applied for a Phase 3 General Distribution. This process carried a November 12, 2021 deadline to request reconsideration. HRSA published Frequently Asked Questions about this process. (Exhibit 9).

51. Plaintiff submitted such a request on November 9, 2021. Exhibit 10. Plaintiff wrote:

> When submitting the application in the portal, we inadvertently entered revenue amounts for Q2 2020 and Q2 2019 where expense amounts should have been entered. The correct expense amounts are included in the support submitted with the original application.

(Exhibit 10 at 2). HRSA confirmed its receipt of Plaintiff's request for reconsideration on January 28, 2022.

52. On April 27, 2022, HRSA notified Plaintiff it had "completed its review of [the] reconsideration request," but refused to make any modifications, declaring:

> We have verified that your original PRF Phase 3 payment determination was calculated correctly and that MERCY HOSPITAL SOUTH will not receive additional PRF Phase 3 funding.

(Exhibit 11 at 2). HRSA further stated:

> You are not receiving additional funding for Phase 3 because you and/or the subsidiary organizations listed in your application received prior PRF payments that were equal to or greater than the calculated Phase 3 payment, or because your payment was below the $100 minimum payment threshold for Phase 3.

(*Id.* at 2-3).

53. HRSA's explanation for why Plaintiff did not receive Phase 3 funding can only be explained by arbitrary and capricious conduct, and an abuse of agency

discretion, insofar as HRSA concluded that it "calculated [the payment determination] correctly" after Plaintiff informed HRSA that the calculation was performed using an input figure that represented Plaintiff's total operating revenues instead of Plaintiff's operating expenses from patient care, as called for in the calculation.

54. HRSA's initial review and later reconsideration of Plaintiff's application was arbitrary and capricious, an abuse of discretion, and contrary to law because HRSA (1) failed to review or consider the financial data contained in the supporting documents that HRSA required Plaintiff to submit with its original application; (2) knowingly miscalculated Plaintiff's Phase 3 General Distribution using data that it knew to be revenue figures rather than the expense figures called for in the calculation; and (3) calculated Plaintiff's Phase 3 General Distribution solely on the basis of Lines 14.2 and 14.4 as originally entered in the application, without validating those figures and despite actual knowledge that they were inaccurate, and without providing prior notice that it would strictly hold applicants to the data entered into their application forms.

55. On April 29, 2022, Plaintiff emailed HRSA explaining further that the data required for HRSA's payment calculation was contained in the original application, but that a data-entry error caused incorrect figures to be shown in the application form:

> We completed the application for Phase 3 and miskeyed expense amounts for Q2 2019 and Q 2020. We submitted the application on time with the tax return. However, due to a keying error, it appeared we were not eligible for Phase 3 dollars. However, based on the correct expense amounts Mercy Hospital South does qualify for Phase 3 under the methodology. The tax returns were provided with the application and if the numbers had not been keyed incorrectly (human error) Mercy Hospital South would qualify for funding.

(Exhibit 11 at 1-2).

56. On May 12, 2022, HRSA responded via email, confirming that it would hold Plaintiff to the Letter Perfect Standard without prior notice and explaining that its standard practice was to wholly disregard applicants' supporting documentation except in limited circumstances, which did not include verifiable human error:

> The Phase 3 reconsideration process did not allow for providers to revise or correct their original Phase 3 applications. ... Supporting documentation was reviewed to validate application data when the application triggered certain flags. Supporting documentation was not used to correct provider errors in the application form.

(Exhibit 12 at 1).

57. Plaintiff subsequently pursued informal resolution with HRSA via emails, letters, and phone calls.

58. Ultimately, in July 2022, HRSA ceased all communication with Plaintiff and its counsel, refusing to respond to emails, phone calls, and voicemails.

59. Despite Plaintiff submitting a timely application, including the appropriate supporting documents, and reporting "health care related expenses or lost revenues that are attributable to the coronavirus," HRSA refused Plaintiff a Phase 3 General Distribution—not because Plaintiff didn't qualify, but due to Plaintiff's data-entry error.

60. HRSA's refusal to issue Plaintiff a Phase 3 General Distribution and its enforcement of the Letter Perfect Standard without prior notice was arbitrary, capricious, in violation of law, and an abuse of discretion.

## VI.   BASES OF APPEAL

### Count I: Administrative Procedure Act

61. Plaintiff realleges and incorporates all previously pleaded paragraphs as though fully set forth herein.

13

62. Plaintiff applied for a Phase 3 General Distribution, met each qualification, and provided information in support of its application. Plaintiff applied HRSA's methodology to its information and estimated HRSA should have issued it $14,300,000.

63. HRSA elected not to consider information in Plaintiff's full application packet and to instead rely exclusively on information input by Plaintiff in the application portal, consequently calculating Plaintiff would receive no Phase 3 General Distribution.

64. Upon learning that it would not receive a Phase 3 General Distribution, Plaintiff sought reconsideration from HRSA.  Plaintiff notified HRSA its calculation was performed using errant data keyed in Lines 14.2 and 14.4 instead of the accurate data contained in Plaintiff's full application.

65. On reconsideration, HRSA again refused to rely on any information other than what was keyed into application form, and additionally refused to correct the form or to otherwise recalculate the payment using the proper expense figures called for by the calculation and contained in Plaintiff's application.

66. This was a final agency action subject to judicial review.  5 U.S.C. § 704.

67. HRSA's application review and reconsideration processes held Plaintiff to a Letter Perfect Standard without prior explicit notice, and imposed conditions upon Plaintiff beyond those created by Congress in its appropriations and those previously published in the Code of Federal Regulations. 45 C.F.R. §§ 75.1-75.218.

68. HRSA's actions and decisions resulting in denial of a Phase 3 General Distribution to Plaintiff were arbitrary, capricious, in violation of law, and an abuse of discretion. 5 U.S.C. § 706.

69. HRSA's actions and decisions directly caused harm to Plaintiff, and Plaintiff is entitled to relief. 5 U.S.C. § 702.

4871-3374-4753v4

## Count II: Violation of Constitutional Due Process

70. Plaintiff realleges and incorporates all previously pleaded paragraphs as though fully set forth herein.

71. Plaintiff has a protected property interest in the Phase 3 General Distribution that HRSA should have distributed, and Plaintiff is entitled to vindicate this property right by appealing HHS's and HRSA's refusal to pay.

72. HRSA's refusal to issue the Phase 3 General Distribution to Plaintiff on grounds that are arbitrary, capricious, in violation of law and abusive of the agency's discretion has furthermore deprived Plaintiff of its Constitutional right to due process.

73. This Constitutional violation is a question of federal law over which this Court has jurisdiction. 28 U.S.C. § 1331.

### VII.  REQUEST FOR RELIEF

74. Plaintiff realleges and incorporates all previously pleaded paragraphs as though fully set forth herein.

75. The All Writs Act provides that federal district courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

76. Further, federal district courts are authorized "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

77. While considering Plaintiff's application for a Phase 3 General Distribution and upon reconsideration at Plaintiff's request, HRSA intentionally disregarded information in Plaintiff's application. HRSA's subsequent refusal to issue a Phase 3 General Distribution to Plaintiff was done in violation of the APA and of Plaintiff's right

15

4871-3374-4753v4

to due process under the Fourteenth Amendment to the United States Constitution. As such, HRSA and HHS have refused to perform duties they owe to Plaintiff in violation of statute, regulation, and federal law.

78. This Court having jurisdiction over this Complaint, Plaintiff thus requests an Order:

    a. Vacating the initial determination of HHS and/or HRSA refusing to issue Plaintiff a Phase 3 General Distribution;

    b. Vacating the reconsideration determination of HHS and/or HRSA again refusing to issue Plaintiff a Phase 3 General Distribution;

    c. Requiring HHS and/or HRSA to process Plaintiff's application using the correct and accurate expense information originally included in Plaintiff's full application submission and to issue any Phase 3 General Distribution that is appropriate on the basis of that correct and accurate expense information;

    d. Requiring HHS and/or HRSA to compensate Plaintiff for all legal fees and costs of suit incurred by Plaintiff and any outstanding interest due and owing pursuant to any applicable statute or regulation; and

    e. Granting any other relief this Court deems just and proper.

Respectfully submitted,

HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.

By:  /s/ Ryan A. McDonald
Ryan A. McDonald, Attorney No. 64017 (MO)
HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.
500 N. Meridian Street, Suite 400
Indianapolis, IN 46204
Telephone No:  (317) 633-4884
Facsimile No:   (317) 633-4878
Email: rmcdonald@hallrender.com
*Attorney for Plaintiff, Mercy Hospital South*